## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

BOBBY BENHAM, JR.                                                    PLAINTIFF

V.                                    NO. 4:11CV00080 JTR

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

### I. Introduction

Plaintiff, Bobby Benham, Jr., has appealed the final decision of the Commissioner of the Social Security Administration denying his claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Both parties have submitted Appeal Briefs (docket entries #11, #14), and the issues are now joined and ready for disposition.

Judicial review of the Commissioner's denial of benefits examines whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole. 42 U.S.C. §§ 405(g), 1383(c)(3); *Wildman v. Astrue*, 596 F.3d 959, 963 (8th Cir. 2010). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In its review, the Court should consider evidence supporting the Commissioner's decision as well as evidence

detracting from it.  *Wildman*, 596 F.3d at 964.  However, a decision will not be reversed merely because substantial evidence would have also supported a contrary outcome, or because the Court would have reached a different conclusion.  *Id.*

On November 7, 2008, Plaintiff protectively filed applications for DIB and SSI, alleging a disability onset date of June 16, 2008.  (Tr. 126-41, 155.)  He reported that he was unable to work due to a bulging disc, a pinched nerve, fibromyalgia and arthritis.  (Tr. 160.)  He was thirty-five years old at the time of his applications, had obtained his GED, and had received vocational training in building and apartment maintenance.  (Tr. 155, 167.)  He had past work as a tank operator in the Army, a cleaning supervisor, a bartender, a food deliveryman and salesman, a factory worker, an automobile salesman, a pest control technician, and a maintenance worker and supervisor at an apartment complex.  (Tr. 36-42, 160-62.)

After Plaintiff's claims were denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge (ALJ).  On September 16, 2009, the ALJ conducted a hearing at which Plaintiff, his wife, and a vocational expert testified.  (Tr. 23-81.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i) &

(b), 416.920(a)(4)(i) & (b).  If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience.  *Id.*

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities.  *Id.* §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c).  If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment, which is presumed to be disabling.  *Id.* §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d).  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has a sufficient residual functional capacity (RFC), despite the impairment(s), to perform the physical and mental demands of past relevant work.   *Id.* §§ 404.1520(a)(4)(iv) & (f), 416.920(a)(4)(iv) & (f).  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given the claimant's RFC, age, education and work experience. *Id.* §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).  If so, benefits are denied; if not, benefits are awarded.  *Id.*

In his October 2, 2009 decision (Tr. 11-22), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since June 16, 2008, his alleged onset date; (2) had "severe" impairments of degenerative disc disease with sacroilitis, piriformis syndrome, status post permanent placement of a spinal cord stimulator, pain disorder due to a general medical condition and psychological factors, cognitive disorder, low average intellectual functioning, and depressive disorder; (3) did not have an impairment or combination of impairments that met or equaled a listed impairment; (4) had the RFC for a limited range of light work; (5) was not fully credible regarding the intensity, persistence and limiting effects of his symptoms; (6) was unable to perform his past relevant work; but (7) considering his age, education, work experience and RFC, and based on the testimony of the vocational expert, was able to perform other jobs that exist in significant numbers in the national economy. Thus,  the ALJ concluded that Plaintiff was not disabled.

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.  (Tr. 1-5.) Plaintiff then appealed the denial of benefits to this Court (docket entry #2).

## II. Analysis

-4-

Plaintiff argues that the ALJ erred: (1) in finding that Plaintiff retained the physical RFC to perform light work; and (2) in disregarding the opinions of a consulting psychologist in determining Plaintiff's mental RFC.   For the reasons discussed below, the Court concludes that Plaintiff's first claim warrants remand.

A.   Physical RFC Determination.

RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his limitations.   20 C.F.R. §§ 404.1545(a)(1), (b) & (c), 416.945(a)(1), (b) & (c).   The ALJ bears the primary responsibility for assessing a claimant's RFC at step four of the sequential evaluation and, "because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."   *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011).

Here, the ALJ determined that Plaintiff had the physical RFC for a limited range of light work, *i.e.*, the ability: to lift, carry, push and pull twenty pounds occasionally and ten pounds frequently; to sit for six of eight hours; to stand and/or walk for six of eight hours; to frequently climb ramps and/or stairs; to occasionally bend, stoop, kneel, crouch and crawl; but to never climb ladders, ropes, or scaffolding. (Tr. 15.)

Plaintiff argues that the record does not contain sufficient medical evidence: (1) that he was physically able to do light work on a full-time, "day-in, day-out" basis;

and (2) that he was able to perform work requiring standing or walking for six hours in an eight-hour workday.

Plaintiff's medical records show that he injured his back at work in September 2007 and again in June 2008.  In treatment notes dated January 3, 2008, W. Michael Roberts, M.D., with Pain Management Center, described Plaintiff's MRI as showing an anular tear at L4-5, a disc bulge at L5-S1, and "some degree of degenerative disc disease." (Tr. 315.)[1]  Later radiology reports in June and August 2008 revealed "an equivocal bulge" at T10-11, but no other abnormalities.  (Tr. 245, 319, 328.)  On September 23, 2008, Michael Mayron, M.D., a neurologist, examined Plaintiff, observed that his MRI scan was "unremarkable," and diagnosed left piriformis syndrome[2] and right sacroilitis.[3]  (Tr. 264-66.)

Throughout 2008, Plaintiff sought treatment for his lower back pain from various physicians, including Mahendra Sanapati, M.D., with Advanced Pain Care

---

[1]The MRI report itself is not in the record.

[2]This is a neuromuscular disorder that occurs when the sciatic nerve is compressed or irritated by the piriformis muscle, which is a narrow muscle located in the buttocks. *Piriformis Syndrome*, National Institute of Neurological Disorders and Stroke, http:// www.ninds.nih.gov/disorders/piriformis_syndrome/piriformis_ syndrome.htm (last updated Feb. 14, 2007).

[3]This is an inflammation of the sacroiliac joints, which connect the lower spine and pelvis. *Sacroilitis*, Mayo Clinic, http://www.mayoclinic.com/health/sacroilitis/DS00726 (last updated July 15, 2010).

Clinic.  In early 2009, Dr. Sanapati diagnosed degenerative disc disease of the lumbar spine and observed that, despite conservative therapy through medication and injections, Plaintiff continued to experience "intractable" low back pain and left lower extremity pain.  (Tr. 326-29.)  On January 6, 2009, Dr. Sanapati surgically inserted a trial spinal cord stimulator.  (Tr. 337.)  Plaintiff reported 60% to 70% improvement in pain relief and function, saying he was sleeping better and walking better.  (Tr. 328, 336.)  Due to these significant results, Dr. Sanapati surgically implanted a dual spinal cord stimulator on February 4, 2009.  (Tr. 326-29.)

Although Plaintiff initially experienced improvement (Tr. 335), he reported on May 1, 2009, that "things are still rough," his pain was still severe on some days, and it hurt to walk.  His lumbar spine was tender to palpation.  The stimulator was reprogrammed, and his medications were refilled for Lortab (a narcotic pain reliever), Lyrica and Zocor.  (Tr. 385.)

On May 8, 2009, a state agency medical consultant, Diosdado Irlandez, M.D., reviewed Plaintiff's medical records and completed a physical RFC assessment.  (Tr. 354-61.)  In that assessment, Dr. Irlandez concluded that Plaintiff had the RFC to perform the exertional requirements of medium-level work, including the ability to stand and/or walk up to six hours in an eight-hour workday.  (Tr. 355.)  As the basis for his conclusions, he noted a January 3, 2009, treatment note where Plaintiff

reported the stimulator was "working well."[4]

On June 10, 2009, Plaintiff returned to see Dr. Sanapati at the pain clinic. He requested an increase in his Duragesic, which is a skin patch containing a narcotic pain medicine. He said his pain was "worse while standing and walking." (Tr. 384.) At his next visit on July 29, he said he had gone to the emergency room the previous night and was given an injection. At the clinic, Plaintiff reported that his pain was worsening and was "shooting down" his legs, and that his stimulator was "not helpful right now." Dr. Sanapati observed that Plaintiff's range of motion was "severely limited." He prescribed Percocet (a narcotic pain reliever) and a Decadron injection. (Tr. 383.) On July 31, it was noted that a CT scan had been within normal limits and that Plaintiff was "doing much better." (Tr. 382.)

On August 18, he returned to the pain clinic. He was still taking Percocet, Lyrica and Naproxen, and was using a Duragesic patch. He said the pain medication was helpful at night and the stimulator was "somewhat helpful." His lumbar spine was noted to be tender. (Tr. 381.)

On October 23, Plaintiff returned to the pain clinic, reported that the stimulator

---

[4]Dr. Irlandez also stated he had reviewed and was affirming a prior RFC assessment by a disability examiner. (Tr. 355.) The examiner (who is not designated as a physician) indicated he was relying on "normal" x-rays in June and August 2008, and exam notes from September 23, 2008, which showed "no muscle weakness, back straight, no kyphosis or scoliosis." (Tr. 296, 302.)

was helpful, and was taking Percocet and Oxycontin (both narcotic pain medications), as well as Lyrica, Flexeril and Naproxen. His spine was tender to palpation. (Tr. 388.) On November 17, it was noted that he was "doing better" with the current pain medication and the stimulator. The clinic notes indicate that he was moving from Kentucky to Arkansas. (Tr. 387.)

On February 5, 2010, he went to Community Medical Clinic as a new patient, reporting that he previously had been receiving pain management care in Kentucky. He was prescribed hydrocodone. (Tr. 394-95.) On March 4, Randal Bowlin, M.D., examined Plaintiff, noting that his discomfort was most prominent in the lumbar spine and radiated to his buttocks, thighs and calves. Plaintiff described his pain as "constant and severe." Dr. Bowlin noted that Plaintiff "appears in pain" and prescribed Oxycontin and Percocet. (Tr. 390-91.)

On March 24, 2010, Plaintiff returned to Dr. Sanapati in Kentucky, reporting that he was having a hard time finding a pain doctor in Arkansas. Dr. Sanapati observed that Plaintiff's lower lumbar spine was tender, and he continued pain medications for three months (Percocet, Oxycontin and Lyrica). (Tr. 400.)

At a visit to Community Medical Clinic on April 27, Plaintiff continued to complain of chronic back pain and his prescriptions were refilled. (Tr. 407-08.) On May 27, he reported that he had "not been doing well," had "bad leg pain," and had

-9-

swelling in his knee and ankle joints.  He said the pain was "unbearable" at times and hindered his ability to walk.  A nurse practitioner noted that Plaintiff was anxious, seemed to be in moderate pain, and had a "slowed" gait.  (Tr. 404-06.)  On May 28, 2010, a wheelchair was ordered for Plaintiff due to "leg weakness."  (Tr. 410.)

The record does not contain a functional assessment of Plaintiff's physical abilities by any of his examining or treating physicians.  The ALJ did not request that Plaintiff be examined by a consulting specialist.  The only physician who has addressed Plaintiff's specific functional abilities was the state agency medical consultant, Dr. Irlandez, who did not examine Plaintiff.  In his decision, the ALJ stated he was assigning "reduced weight" to the agency opinion that Plaintiff could perform medium-level work because "more recent evidence confirms that despite the fact the claimant has a stimulator implanted, he has had some difficulty getting it properly adjusted."  The ALJ further stated that, by Plaintiff's own admission, his symptoms had improved with adjustments to the stimulator and that his RFC assessment accounted for Plaintiff's residual symptoms.  (Tr. 19.)

While the ALJ assessed an RFC with the lesser lifting/carrying exertional requirements of light work,[5] he nevertheless adopted Dr. Irlandez's finding that

---

[5]*Cf.* 20 C.F.R. §§ 404.1567(b), 416.967(b) (light work involves lifting/carrying up to 20 pounds at a time with frequent lifting/carrying up to 10 pounds); *with id.* §§ 404.1567(c), 416.967(c) (medium work involves lifting/carrying up to 50 pounds at a

Plaintiff was able to stand/walk for six hours out of an eight-hour day. (Tr. 15.)  The record does not contain sufficient medical evidence to support this finding.

The "opinions of non-examining sources are generally ... given less weight than those of examining sources." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008); *see* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  The regulations also provide that, when evaluating a non-examining source's opinions, the ALJ must consider the "supporting explanations" provided by the source and "the degree to which these opinions consider all of the pertinent evidence," including "opinions of treating and other examining sources."  20 C.F.R. §§ 404.1527(d)(3) & (f)(2)(ii), 416.927(d)(3) & (f)(2)(ii).

The medical records – and Plaintiff's own testimony – confirm that insertion of the spinal cord stimulator in January 2009 did alleviate his pain to some extent and that, at least in the first month or two, reprogramming the stimulator would afford him additional relief.  However, Dr. Irlandez did not have before him the more recent evidence from Plaintiff's treating and examining medical providers, which shows: (1) Plaintiff's report in May 2009 that, while the stimulator helped at first, he was still experiencing severe pain some days and it hurt to walk; (2) his treating physicians' observations in May, August and October 2009, and in March 2010, that the lumbar

---

time with frequent lifting/carrying up to 25 pounds).

spine was tender to palpation; (3) his report in June 2009 that his pain was worse while standing and walking; (4) his treating physician's observation in July 2009 that Plaintiff's range of motion was "severely" limited; (5) Plaintiff's report in July 2009 that the stimulator was "not helpful" to relieve pain that was shooting down his legs; (6) his description of "constant and severe" pain in March 2010, and the examining physician's observation that he appeared to be in pain; (7) his report in May 2010 that he was "not doing well" and had "bad leg pain" which was unbearable at times and hindered his ability to walk; (8) a nurse practitioner's observation in May 2010 that he seemed to be in moderate pain and had a slowed gait; and (9) the ordering of a wheelchair by a medical provider due to "leg weakness" on May 28, 2010. Significantly, the medical records document that, from June 2008 through May 2010, Plaintiff's treating physicians continuously prescribed narcotic pain medication in response to his complaints of pain.

Thus, the only medical evidence supporting the ALJ's standing/walking RFC finding is Dr. Irlandez's conclusion, which was based on an incomplete medical record.   This falls short of the required medical evidence  necessary to support an RFC determination.

In making his physical RFC assessment, the ALJ also relied on Plaintiff's testimony that he was able to "drive, prepare microwave meals, fold laundry, wash

dishes, attend to his personal needs, ... engage in other simple type activities such as watching television," and enjoy "limited fishing, and deer hunting." (Tr. 18, 19-20.) However, this testimony does not support a finding that Plaintiff was able to stand or walk for six hours a day. Plaintiff reported that, although he washed dishes, it "hurts to stand up over the sink" and he had to "stop in [the] middle of them and sit down" for a half-hour or so, then go back and finish the dishes later. (Tr. 58, 193, 202.) Plaintiff and his wife reported that he "used to be an avid deer hunter, but not so much anymore," had last hunted in 2008 but could no longer climb a tree to hunt, and "every now and then" tried "to sit and do a little fishing." (Tr. 58, 195, 204).

In an April 2009 function report – completed three months after insertion of the spinal stimulator – Plaintiff said he could walk for "maybe fifteen minutes" before needing to stop and rest. (Tr. 205.) At the hearing in September 2009, he testified that the stimulator had improved his walking so that he went from "not being able to hardly stand on my legs" to walking about twenty minutes at a time. (Tr. 46.) He said the pain before the stimulator was "excruciating," and at the time of the hearing still was "a constant throb," with "stabbing" pain two or three weeks out of the month. (Tr. 46-47.) He said his pain traveled from his lower back up the center of his spine to about his shoulder blades, and from the top of his buttocks and hips down the back of his legs. He said his pain was made worse by "standing too long or walking too

long, or sitting too long or laying too long." (Tr. 48.)  He said he could stand or walk for about twenty to thirty minutes at a time, and sit about twenty to thirty minutes. (Tr. 51-52, 74.)  He said that, during the day, he constantly had to alternate positions between standing, walking around, sitting in a chair, or lying down.  (Tr. 74, 200.)

Thus, as a whole, the record does not support the ALJ's determination that Plaintiff was capable of standing/walking up to six hours in an eight-hour day.  This case must be remanded so that the ALJ can identify or, if necessary, obtain specific medical evidence to support a finding that Plaintiff is capable of performing the standing/walking requirements for light work.  *See* SSR 83-10, 1983 WL 31251, *5-*6 (1983) (light work generally requires "a good deal of walking or standing," and the full range of such work requires "standing or walking, off and on," a total of six hours in an eight-hour workday, with sitting "occur[ring] intermittently during the remaining time").  If necessary, the ALJ should reformulate his RFC assessment based on the medical evidence.  Because Plaintiff's ability to stand/walk for extended periods of time could also affect his ability to perform light work on "a regular and continuing basis," the ALJ should make any necessary adjustments in his RFC assessment and discussion to ensure that this matter is adequately addressed.

B.    Mental RFC Determination.

The ALJ found that Plaintiff had the mental RFC: to understand and recall

-14-

simple work procedures and instructions; to maintain attention for two-hour periods across a normal workday; to complete routine mental aspects of making work-related decisions without special supervision following a routine schedule; to tolerate co-workers and accept supervision in an object-focused context with infrequent and casual contacts; and to adapt to gradual change and appreciate work hazards on the job.  (Tr. 15.)

Plaintiff asserts that, in formulating this RFC, the ALJ erred in attributing greater weight to the opinions of the state agency reviewers than to the opinion of Jennifer Fishkoff, Psy. D., who performed a consultative mental evaluation of Plaintiff on January 8, 2009.  Plaintiff points to Dr. Fishkoff's opinion that he did "not appear to be capable of tolerating the stress and pressures associated with day-to-day work activity," and to her assessment of a current GAF (Global Assessment of Functioning) of 45, indicating serious limitations.  (Tr. 274.)[6]

The ALJ is entitled to discount the opinion, in whole or in part, of a one-time

---

[6]The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness."  *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009).  A GAF score reflects a clinician's assessment of an individual's overall level of functioning at the time of the evaluation, and is intended for use in planning treatment and measuring its impact. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).  A GAF of 41 to 50 indicates the individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning.  *DSM-IV-TR* at 34.

examining medical source, particularly when it is inconsistent with other evidence in the record. *See Vandenboom v. Barnhart*, 421 F.3d 745, 749-50 (8th Cir. 2005); *Hilkemeyer v. Barnhart*, 380 F.3d 441, 446 (8th Cir. 2004) (ALJ was justified in rejecting opinion of source who conducted single mental examination); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (factors to evaluate in determining weight given to medical opinions, including "frequency of examination" and "consistency").

The ALJ discussed Dr. Fishkoff's findings in detail. (Tr. 18-19.) While he credited some of her findings, he explicitly discounted her conclusion that Plaintiff appeared unable to handle stress and her GAF assessment of serious limitations in functioning. (Tr. 19.) The record contains substantial evidence to support the ALJ's decision in this regard.

First, Plaintiff did not allege inability to handle stress, depression, or any other mental impairment or limitations, as a basis for disability in the initial disability report he completed in connection with his application. (Tr. 160.) When asked at the administrative hearing to identify the conditions that limited his ability to work, he referred only to physical problems (Tr. 43-44), and he described his depressive symptoms only when asked about them by the ALJ (Tr. 53-55). This weighs against a finding of significant limitation due to a mental impairment. *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011); *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir.

2001) (failure to allege depression in benefits application is significant, even if evidence later developed).

Second, as discussed by the ALJ (Tr. 18-19), the records from Plaintiff's medical providers contain very few references to mental health problems. The first is on October 9, 2008, when he went to River Valley Behavioral Health. He complained of difficulty sleeping and general tiredness, impulsiveness and anger control issues, and problems with "distractability and focus." He reported that he had been treated for mental health problems before, which helped his tiredness but not his depression. (Tr. 251.) The psychological examiner did not provide a diagnosis, but noted that Plaintiff's participation was "active" and "appropriate," his insight was "forming," his affect was "appropriate," he was cognitively "oriented," and his progress was "stable." (Tr. 256-58.) Plaintiff did not seek any follow-up treatment at the clinic.[7]

The next reference was on December 26, 2008, when Plaintiff told Dr. Debra Wallace, his primary care physician, that he "thinks he is depressed because he can't work." (Tr. 320.) Dr. Wallace stated that she thought he had "some depression" and that "part of it may be situational." She prescribed Paxil, an antidepressant.

---

[7]The ALJ incorrectly stated that Plaintiff "cancelled his follow-up appointment." (Tr. 18.) The cancellation was for a *prior* appointment on September 22, 2008. (Tr. 259.)

Subsequent treatment notes show that, while seeking medical treatment for his physical problems, he reported Paxil as one of his medications on five occasions from December 2008 to June 2009.  (Tr. 328, 335, 336, 338, 384.)  No other medical records mention mental limitations or related medication.  *See Partee*, 638 F.3d at 864 (lack of relevant medical evidence is factor to consider in determining whether claimant suffered from debilitating mental impairment); *Dunahoo*, 241 F.3d at 1039-40 (depression did not result in significant functional limitations where claimant was admitted to mental health center but did not follow up, doctors continued antidepressant medication, and symptoms were situational).

Third, as noted by the ALJ (Tr. 19), Dr. Fishkoff's lone GAF assessment and her finding regarding Plaintiff's inability to handle stress were inconsistent with Plaintiff's testimony that he was able to remain functional by preparing simple meals, shopping with his wife, driving, handling the checkbook and savings account, making change, visiting with family and friends, enjoying limited fishing and hunting, folding laundry, and washing a few dishes.  The ALJ properly found that these admitted activities showed Plaintiff was capable of performing simple types of tasks on a daily basis.  *See Brown v. Astrue*, 611 F.3d 941, 955-56 (8th Cir. 2010) (daily activities were inconsistent with allegation of disabling mental impairment).

Finally, Dr. Fishkoff's assessment of serious functional limitations and an

inability to handle work stresses was inconsistent with the opinions of the state agency psychological consultants, Ed Ross, Ph.D., and Alex Guerrero, M.D., who reviewed Plaintiff's medical records and prepared mental RFC assessment forms.  (Tr. 276-93, 363-80.)  The ALJ assigned "great weight" to the state agency opinions. (Tr. 19.)  In their assessments, Drs. Ross and Guerrero found that, out of twenty specified mental activities, Plaintiff was "not significantly limited" in sixteen categories and had "moderate" limitations in four.[8]  (Tr. 276-77, 363-64.)

Dr. Ross wrote almost a full page elaborating on his conclusions,[9] discussing: the sparse evidence of mental health treatment or mental difficulties; Plaintiff's subjective allegations; and the findings and opinions of the "Psy CE Vendor" (Dr. Fishkoff).  (Tr. 278.)  He gave Dr. Fishkoff's opinions "little weight," noting that Plaintiff and his spouse were vague when questioned by Dr. Fishkoff about their daily activities, Plaintiff had been able to "get his deer this season" and retained interest in such outdoor activities, and Plaintiff indicated that the sun set "in the sky" when

---

[8]The doctors found that Plaintiff was moderately limited in his ability: (1) to maintain attention and concentration for extended periods; (2) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (3) to interact appropriately with the general public; and (4) to carry out detailed instructions. There is no category on the form specifically addressing the ability to deal with work-related stress.

[9]This is in contrast to the state agency physical RFC assessment forms, which contained minimal elaboration as discussed above.

questioned about the direction of the sun setting.   Dr. Ross concluded that, "[o]n balance, the mental residuals and [Plaintiff's] history would not be incompatible with some [substantial gainful activity] settings."   He then described specific mental skills which Plaintiff retained the ability to perform: (1) understanding and recalling simple and some detailed work procedures and instructions, and maintaining attention for two-hour periods across a normal workday; (2) completing routine mental aspects and making associated work-related decisions, without special supervision, following a regular schedule; (3) tolerating co-workers and accepting supervision in an object-focused context with infrequent and casual contacts; and (4) adapting to gradual change and appreciating work hazards on the job.  (Tr. 278.)  Dr. Guerrero affirmed Dr. Ross's opinions.  (Tr. 365.)

    In his decision, the ALJ formulated a mental RFC assessment that mirrored Dr. Ross's four conclusions  regarding Plaintiff's mental skills, yet further limited him to the ability to understand and recall only "simple" procedures and instructions.   (Tr. 15.) Thus, it is clear that, in making his mental RFC determination, the ALJ considered the medical and non-medical evidence, credited the evidence and allegations of mental limitations to some degree, and factored those limitations into his assessment.  The record as a whole contains substantial evidence to support the ALJ's mental RFC determination, including his decision to discount Dr. Fishkoff's

GAF assessment and her opinion that Plaintiff appeared incapable of dealing with work-related stress.

### III. Conclusion

For the foregoing reasons, the Commissioner's decision is reversed and remanded so that the ALJ can consider and identify the necessary medical evidence to support his physical RFC determination.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is **reversed** and this matter is **remanded** to the Commissioner for further proceedings consistent with this opinion.  This is a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 7th day of November, 2011.


_____
UNITED STATES MAGISTRATE JUDGE